UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA

United States of America,                Criminal No. 17-107(5) (DWF/TNL)

            Plaintiff,

v.                                       **ORDER AND MEMORANDUM**

Saowapha Thinram,
a/k/a Nancy,
a/k/a Kung,

            Defendant.


This matter is before the Court pursuant to Defendant Saowapha Thinram's ("Defendant") Appeal from an Order for Detention Filed in Texas. (Doc. No. 303.) On August 28, 2017, the United States of America ("the Government") filed a Response in Opposition to Motion to Reconsider Detention Order. (Doc. No. 345.)

On September 20, 2017, a detention hearing was held before the undersigned. At the hearing, the Court took the matter under advisement.

                            **ORDER**

1.      Defendant Saowapha Thinram's Appeal from an Order for Detention Filed in Texas (Doc. No. [303]) is respectfully **DENIED**.

Dated: September 26, 2017          s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   United States District Judge

**MEMORANDUM**

The Second Superseding Indictment before the Court charges Defendant with Conspiracy to Commit Sex Trafficking, in violation of 18 U.S.C. § 1594 (Count 1); Conspiracy to Commit Transportation to Engage in Prostitution, in violation of 18 U.S.C. § 371 (Count 3); Conspiracy to Engage in Money Laundering, 18 U.S.C. § 1956 (Count 4); and Conspiracy to Use a Communication Facility to Promote Prostitution, 18 U.S.C. § 371 (Count 5). (Doc. No. 314.)

Defendant is alleged to be one of the house bosses for the sex-trafficking organization, along with her husband, Co-Defendant Gregory Allen Kimmy ("Kimmy"). House bosses are alleged to have run the day-to-day operations, including advertising victims for commercial sex acts, procuring and maintaining the houses of prostitution, scheduling sex buyers, and ensuring that a portion of the cash was routed back to pay down the victims' bondage debts. (Indictment ¶ 5(b).) In exchange, house bosses retained a significant portion of the cash that the victims receive, typically forty percent. (*Id.*) House bosses would also coordinate with traffickers and other house bosses to facilitate the victims' travel to other cities in the United States. Once victims were lured to the United States, they were forced to work long hours—often all day, every day—having sex with strangers to attempt to pay down their bondage debt. Victims typically did not have the ability to choose with whom they had sex, what sex transactions they would engage in, or when they would have sex. Defendant and her husband are lessors

2

of a house where law enforcement observed activity consistent with an active house of prostitution.

According to the search warrant affidavit, Special Agent Tonya Price interviewed victim prostitutes identified as W-2, W-41, and W-42. W-2 identified Defendant as "Nancy" and stated that Defendant ran a "working" house of prostitution in Austin, Texas, and charged $60 per commercial sex act as the "house fee." W-2 also stated that Defendant advertised W-2 and other Thai women online using ECCIE.net. Further, W-2 told Agent Price that Defendant would call W-2 to let her know when a commercial sex buyer was coming. W-2 also stated that Defendant took a photograph of her passport book.

Special Agent Price also interviewed W-41 who stated that she had recently paid off her $40,000 bondage debt, which took approximately six months to complete. She did not claim that that the debt was paid to either Defendant or Co-Defendant Kimmy. W-41 did state, however, that she was sent to various houses of prostitution in Kirkwood, Washington; Kansas City; Los Angles; and Houston and Austin, Texas. W-41 also stated that she paid Co-Defendant Kimmy and Defendant half of the money she earned from commercial sex acts.[1]

On May 30, 2017, the Honorable Andrew W. Austin in the District Court for the Western District of Texas, Austin Division, held a detention hearing pursuant to the

---

[1] The Court would also note that it reviewed the transcript from the joint hearing in Texas to address Co-Defendant Kimmy's motion for release as well as Defendant's. The Agent gave nicknames to each of the prostitute informants.

Government's motion to detain Defendant pending trial. The Magistrate Judge observed that Defendant has few ties to the United States: Defendant first came to the United States as a victim-prostitute in the same sex trafficking scheme implicated in this case. Consequently, when Defendant paid off her "debt" to gain her freedom, she remained in the United States. Defendant also has an 11-year-old son who resides in the Austin, Texas area with her and who is a lawful permanent resident. Due to the fact that both Defendant and her husband have been detained, Defendant's mother-in-law has been caring for Defendant's 11-year-old son and Kimmy's other three children.[2]

The Magistrate Judge also observed that Defendant has many ties to Thailand: All of Defendant's siblings and her mother reside in Thailand, as does her 19-year-old son. Additionally, Defendant owns a residence in Thailand. Defendant, however, does not have a bank account in her name and, in the words of the Magistrate Judge, "relies entirely on her husband for access to money." Defendant last traveled to Thailand in 2015 to visit her son, who was diagnosed with leukemia, and whose medical care she pays for. She and Kimmy also traveled to Thailand in 2014 for the same purpose.

Pursuant to Rule 46(b) of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3142, the Court considered the following factors in assessing the continued detention of Defendant:

    (1)    the nature and circumstances of the offense charged, including whether the offense involves . . . a minor victim;

---

[2] The Court also notes that Defendant's mother-in-law was present for both Kimmy's and Defendant's hearings before this Court on September 19 and 20, 2017, respectively.

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B) whether, at the time of the current offense or arrest, the person was on probation . . . .

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Pretrial detention may be ordered either upon a clear and convincing showing that release would result in a danger to the community or upon a showing by a preponderance of the evidence that the release will result in a serious risk of flight. *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986). Additionally, if a court "finds that there is probable cause to believe that the person committed an offense under chapter 77 of [Title 18] for which a maximum term of imprisonment of 20 years or more is prescribed," then the court employs a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C § 3142(e)(3)(D).

Here, Defendant has been charged with Conspiracy to Commit Sex Trafficking by Force, Fraud, and Coercion, in violation of 18 U.S.C. § 1594 (Count 1), a Chapter 77

5

offense punishable by up to life in prison. Defendant was the lessor of the house of prostitution and witnesses will testify to Defendant's role as a house boss. Given these particular allegations, there is probable cause to believe that Defendant committed Count 1 of the Indictment. As a result, Defendant must overcome the rebuttable presumption of detention.

"In a presumption case such as this, a defendant bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence he does not pose a danger to the community or a risk of flight." *UAbad*, 350 F.3d at 797 (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)). Once a defendant has met his burden, a presumption favoring detention "remains a factor to be considered among those weighed by the district court." *Id.*

Based upon all of the facts and circumstances of this case, the Court concludes that Defendant has failed to overcome the presumption of detention. The Court notes that Defendant is facing up to life in prison, has few ties to the United States or Minnesota, and has many ties to Thailand. Moreover, the criminal organization is ongoing, and a person in Defendant's position, with the help from the organization, could find a way to take her son and flee to Thailand. These factors weigh heavily toward detention.

But this outcome is not an easy one. The Court concurs with Magistrate Judge Austin who noted that it was truly an understatement to call Defendant's circumstances complicated. Defendant was first brought to the United States as an indentured prostitute. Thus, Defendant was, not too long ago, one of the vulnerable, impoverished

victims exploited by the criminal organization. Further, Defendant speaks little-to-no English and has no access to a bank account except through her husband. The circumstances become even more complicated when the Court considers Defendant's 11-year-old son here in the United States and her 19-year-old son who is battling leukemia in Thailand. However, the Court does find that Defendant has failed to overcome the presumption that no conditions or combination of conditions will reasonably assure her appearance before this Court, especially given the nature of the potential sentence in this case, her lack of serious contacts with the United States and her connections to Thailand. Consequently, the Court respectfully denies Defendant's request for release.[3]

D.W.F.

---

[3] The Court did consider placing Defendant in a half-way-house setting. However, unless that half-way-house setting was in Texas, it would provide little benefit to her, although it would be a less restrictive setting with respect to contact with her son. Moreover, given the Court's findings and conclusion addressing the flight risk issue, even a strict GPS monitoring system would not be a condition that would reasonably assure the appearance of Defendant before this Court.